**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEREMY JACKSON, | ) | |
| | ) | Case No. |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| ANTHONY WOJCIK, JANIT HOWARD, | ) | |
| JOHN TRAHANAS, PETE BEST, DANIEL | ) | |
| ENGEL, the CITY OF CHICAGO, COOK | ) | |
| COUNTY STATE'S ATTORNEY JOSEPH | ) | |
| CATALDO, DR. KENDALL CROWNS and | ) | |
| COOK COUNTY. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Jeremy Jackson, by his attorneys, Loevy & Loevy and Jennifer Blagg, complains of Defendants Anthony Wojcik, Janit Howard, John Trahanas, Pete Best, Daniel Engel, the City of Chicago, Cook County Assistant State's Attorney Joseph Cataldo, Dr. Kendall Crowns, Cook County, and as-yet unknown employees of the City of Chicago and Cook County, and states as follows:

## INTRODUCTION

1.      Plaintiff Jeremy Jackson spent twenty years in prison for a crime he did not commit.

2.      At seventeen years old, Jackson was coerced into falsely confessing to the murder of Mitchell Dotson. That coerced confession led to his wrongful conviction and twenty years of incarceration, before he was finally exonerated in 2022.

1

3.     Jackson's false confession, like too many others in the City of Chicago, was the product of physical and psychological abuse by Chicago Police Department officers. They beat and threatened Jackson and denied him access to his sister and mother and to a lawyer during his interrogation. Following this abuse, Jackson signed a false confession implicating himself in a murder he did not commit.

4.     Not one piece of physical evidence ever connected Jackson to the crime.

5.     At trial, no witness testified to seeing Jackson shoot Dotson.

6.     Indeed, the person who shot Dotson, and the person all eyewitnesses identified as the sole shooter, has admitted it, and testified under oath that Jackson was not involved in any way.

7.     After two decades of fighting for his freedom, having spent over half his life in prison, Jackson was finally exonerated. He will never recover that lost time. But he brings this lawsuit seeking justice for the harms Defendants inflicted on him and the systemic abuse that allowed his wrongful conviction to happen.

## JURISDICTION AND VENUE

8.     This action is brought pursuant 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation of Plaintiff's rights secured by the United States Constitution.

9.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

2

**PARTIES**

11.     Plaintiff Jeremy Jackson is a resident of Illinois. He spent twenty years in prison for a crime he did not commit.

12.     At all times relevant to the events described in this complaint Anthony Wojcik, Janit Howard, John Trahanas, Pete Best, Daniel Engel, and other unknown law enforcement officers, were police officers employed by the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

13.     At all relevant times, Defendant Wojcik and other unknown law enforcement officers supervised the other officers in the preceding paragraph. Acting under color of law and within the scope of their employment for the City of Chicago, they facilitated, condoned, approved, and turned a blind eye to the constitutional violations committed by the officers in the preceding paragraph.

14.     Defendants Wojcik, Howard, Trahanas, Best, and Engel, and other unknown law enforcement officers, are referred to collectively as "Defendant Officers" throughout this Complaint.

15.     At all relevant times Defendant Joseph Cataldo was an Assistant Cook County State's Attorney. He is sued for actions he undertook, in conspiracy with the Defendant Officers, in his capacities as an investigator and without probable cause to believe that Plaintiff had committed any crime.

16.     At all relevant times Defendant Dr. Kendall Crowns was a Deputy Medical Examiner, employed by Cook County.

17.     Defendant City of Chicago is a municipal corporation that is or was the employer of the above-named Defendant Officers. Each of the Defendant Officers acted during their investigation as agents or employees of the City of Chicago. The City of Chicago is liable based

3

on respondeat superior for the acts of the Defendant Officers. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

18.     Defendant Cook County is a governmental entity within the State of Illinois, which provides funding for the Cook County State's Attorney's Office and was at all relevant times the employer of Defendant Cataldo and Defendant Crowns. Defendant Cook County is a necessary party to this lawsuit and is responsible for paying any judgment entered against Defendant Cataldo and Defendant Crowns.

19.     Each of the individually named defendants acted under color of law and within the scope of their employment at all times relevant to this lawsuit. Each individual Defendant is sued in his or her individual capacity.

**FACTS**

**The Murder of Mitchell "Ogar" Dotson**

20.     Late in the evening on July 12, 2000, on Lockwood Avenue in Chicago, a group of men, including Mitchell "Ogar" Dotson, were drinking and talking on a corner.

21.     At some point, another group of men including Anthony "Lil' Tony" Curtis approached the corner and gunshots rang out. Curtis had shot and killed Dotson.

22.     Jackson, who was not involved in the crime in any way, later learned from friends in the neighborhood that Dotson had been murdered.

23.     The witnesses interviewed immediately on the scene told police officers they had seen Curtis shoot Dotson.

24.     None of the witnesses at the scene reported seeing Jackson shoot Dotson.

4

## Police Investigation

25.      Despite initial leads pointing to Curtis, it was not until January 28, 2001, that officers finally arrested and interviewed Curtis.

26.      Up to that point, multiple witnesses had identified Curtis as the shooter who killed Dotson. And up to that point, not one person had ever implicated Jackson in the shooting.

27.      Nor had any witness ever said there was more than one shooter.

28.      The Defendant Officers, including Defendants Engel and Wojcik, interrogated Curtis. After Defendants informed Curtis that they had interviewed two scene witnesses who implicated Curtis, he confessed to shooting Dotson.

29.      After Curtis's confession, Defendants had all the evidence they needed to charge and successfully prosecute Curtis. But they did not stop there.

30.      The Defendant Officers continued their interrogation of Curtis to get him to implicate a second person in the crime, even though there was no evidence of a second shooter and no witness to the shooting had implicated a second shooter.

31.       Curtis repeatedly told the Defendant Officers the truth—that he shot Dotson and there was no second shooter involved. The Defendant Officers, however, continually pressured Curtis to name a second shooter.

32.      Defendant Officers made false promises to Curtis to coerce him into falsely naming a second shooter.

33.      Defendant Officers specifically pressured Curtis to name Jackson as the second shooter.

34.    As a result of this unflagging pressure and Defendant Officers' repeated promises and threats, Curtis, who had a personal grudge against Jackson, agreed to falsely name him as the second shooter.

35.    The Defendant Officers notified Defendant Cataldo of the Felony Review Unit that Curtis had just confessed to shooting Dotson.

36.    Defendants Cataldo, Engel, and Wojcik then conducted additional interrogations of Curtis. As the result of the Defendants' coercion, Curtis again falsely implicated Jackson as a second shooter.

37.    The Defendant Officers and Defendant Cataldo knew that Curtis's implication of Jackson was unreliable. It was not supported by the physical evidence from the crime scene (discussed below); Curtis had been pressured and subjected to coercive interrogations to force him to implicate a second person in the shooting; and multiple eyewitnesses to the shooting had identified Curtis as the sole perpetrator, without making any claim that Jackson had been involved, or that there was a second shooter at all.

38.    For example, Defendants interviewed witnesses who were at the scene with Dotson. None of them identified Jackson as a shooter. And one of them specifically identified Curtis as the shooter.

39.    And on January 29, 2001, when Defendants reinterviewed a woman who had also seen the shooting, she positively identified Curtis as the shooter but never mentioned Jackson. The woman had also told Defendants three months earlier that Curtis was the shooter—the only shooter.

40.     Despite the overwhelming evidence that Curtis's implication of Jackson was obviously false, and the product of Defendant Officers' coercive interrogation of Curtis, the Defendants set out to frame Jackson as a second shooter.

**Defendants Coerce Jackson into Signing a False Confession**

41.     On January 31, 2001, six months after the murder of Dotson, Defendants conducted an hours-long interrogation of Jeremy Jackson, who was just seventeen years old.

42.     Jackson had slept very little the night before Defendants' interrogation.

43.      The Defendant Officers, including Detectives Trahanas and Best, along with Defendant Cataldo, began a coordinated, continuous, guilt-presumptive interrogation of Jackson that spanned many hours. They took turns questioning Jackson, coming in and out of the room, and employing physically and psychologically abusive tactics intended to cumulatively overcome Jackson's will.

44.     Jackson was not allowed to call his mother, despite asking repeatedly, nor was he read his Miranda rights at any point during the interrogation.

45.     Jackson was not allowed to see his sister, who was nearby and requesting to talk to him.

46.     The Defendants berated Jackson, repeatedly telling him that they knew he had shot Dotson and that Curtis had told them Jackson had been involved in the murder.

47.     Jackson truthfully told the Defendants he had heard that Dotson had been shot the previous summer but that he had nothing to do with the shooting.

48.     Defendants continued to threaten Jackson, telling him—falsely—that numerous witnesses had implicated him in the murder and that he was facing life in prison for his participation in the shooting.

49.     Jackson was scared, but he continued to tell the truth: that he had nothing to do with the shooting of Dotson.

50.     The interrogation went on for hours, with the Defendants repeatedly coming into the room and insisting that they knew Jackson had shot Dotson, and Jackson repeatedly denying that he had shot Dotson or that he had been involved in the shooting in any way.

51.     The Defendants were not willing to give up on getting the confession they wanted, however. They knew that with only the statement of Curtis, and without any scene witnesses or physical evidence implicating Jackson, it was unlikely that Jackson could be charged and/or convicted. They escalated their use of coercive tactics.

52.     One of the Defendant Officers stood up and started yelling in Jackson's face that he was going to get life in prison for the murder of Dotson.

53.     When Jackson continued to truthfully deny any involvement in the murder, one of the Defendant Officers slapped Jackson hard across the face and repeatedly punched him in the chest, at least five or six times.

54.     As part of their coordinated efforts, the other Defendants stepped out of the room just before the violent attack, and then reentered the room immediately afterward.

55.     At that point, Jackson was tired, terrified, and in shock. The threats and violence had gone on for hours.

56.     Defendants then took Jackson to another room and showed Jackson the video they had made of Curtis's confession, in which he implicated Jackson.

57.     After the tape finished, Jackson was led back to the interrogation room, where the Defendant Officers and Defendant Cataldo continued the interrogation.

58.     Defendants, knowing that Jackson had slept very little the previous night, told Jackson that if he told them he had shot Dotson, he could leave and go to sleep.

59.     At that point, terrified, hopeless, and physically and emotionally exhausted, Jackson's will had been completely overborne. Jackson agreed to give a statement saying whatever the Defendants wanted.

60.     Defendants told Jackson exactly what to say, and Defendant Cataldo wrote out the handwritten statement.

61.     The statement, concocted by Defendants, was riddled with factual errors that made it obvious that it was false and the product of coercion.

62.     For example, the statement states that on the day of the shooting Jackson was with a particular person, but that person was actually incarcerated at the time of the shooting.

63.     The details in the statement were entirely fabricated and fed to Jackson by Defendants.

64.     Jackson's confession was signed at 11:10 p.m., many hours after the interrogation started.

65.     Based on the fabricated, false, and coerced confession that Defendants extracted from Jackson, he was charged with the murder of Dotson.

**Jackson's Wrongful Prosecution and Conviction**

66.     Following this coerced confession, Defendants fabricated additional evidence to support their theory that Jackson was a second shooter.

67.     The initial autopsy of Dotson's body revealed two gunshot wounds. The Defendant Officers conspired with Defendant Dr. Kendall Crowns to create "scientific" evidence

that was entirely false: that the nature of the two gunshot wounds indicated that they were fired from two different guns.

68.     This evidence was made-up. It was not based on any scientific principles, or any science at all. In fact, Defendant Crowns did not even conduct the autopsy, yet agreed to create this false scientific evidence to bolster the prosecution of Jackson.

69.     In addition, weeks after the shooting, Defendants Trahanas and Howard conducted a lineup in which they manipulated and coerced witnesses into falsely identifying Jackson as a second shooter, even though there was no second shooter, as Curtis has admitted.

70.     Defendant Officers fabricated evidence, including police reports, to cover up their misconduct, and they provided those false reports and other evidence to state prosecutors.

71.     Defendant Officers' fabricated evidence became the basis for charging and prosecuting Jackson.

72.     In 2002, as a result of Defendants' misconduct and based on the false evidence described in this complaint, Jackson was prosecuted for the murder of Dotson.

73.     No physical evidence ever linked Jackson to the crime.

74.     Defendants concealed the coercion and physical abuse they had used to force Jackson to implicate himself in Dotson's murder. Defendants also hid the fact that the information in Jackson's confession had been fed to him by the Defendants.

75.     Defendants also concealed Curtis's repeated denials that there was ever a second person who also shot Dotson, as well as the threats and promises they made to Curtis to get him to falsely implicate Jackson as a second shooter in Dotson's murder.

76.     Defendant Officers hid their fabrication of evidence from trial prosecutors and from Jackson's defense team before his trial, and they suppressed all evidence that exonerated Jackson.

77.     Defendant Officers gave false statements to state prosecutors, and Defendants Cataldo, Trahanas, and Crowns provided false testimony at Jackson's trial.

78.     The only evidence introduced at Jackson's trial implicating him in the murder was the material Defendant Officers fabricated and coerced.

79.     Because of Defendants' false and manufactured evidence, Plaintiff was wrongfully convicted and sentenced to 50 years in prison.

80.     He was nineteen years old at the time he was convicted, and he was completely innocent, as Defendants well knew.

81.     But for the Defendants' misconduct, Plaintiff would have been neither prosecuted nor convicted.

**Jackson's Exoneration**

82.     After his conviction, Plaintiff fought hard to prove his innocence. He filed a direct appeal immediately after his conviction and a pro se post-conviction motion in 2006.

83.     In 2012, Jackson hired private counsel. Jackson then filed an amended post-conviction petition in November 2016 detailing Defendants' abuse during his interrogation.

84.     During Jackson's post-conviction hearing, Curtis stated that Jackson had never shot Dotson and that he, Curtis, was the only actual shooter.

85.     In addition, the forensic pathologist that actually conducted the autopsy of Dotson testified that there was no evidence of a second shooter, and that the injuries were likely caused by a single shot from the same gun. In addition, the forensic pathologist testified that Dotson's

injuries were inconsistent with a close-range shooting, contradicting Jackson's coerced false statement.

86.     Jackson's conviction and sentence were vacated on June 1, 2022.

87.     After twenty years in prison, the 38-year-old Jackson was finally freed.

**Policy and Practice of Wrongfully Convicting Innocent People**

88.     The Defendants' misconduct in this case was no isolated occurrence.

89.     The City of Chicago and the Chicago Police Department are responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of incidents like the one Jackson endured.

90.     Since 1986, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes he did not commit.

91.     These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including fabricating evidence, concealing exculpatory evidence, manipulating eyewitnesses testimony, abusing and coercing suspects into falsely implicating themselves, and using other tactics to secure arrest, prosecution, and conviction without probable cause and without regard for the person's actual guilt or innocence.

92.     At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal

defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

93.     Consistent with municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

94.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, inter alia, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

95.     The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera*, *Fields*, and *Jones* applied throughout the 1980s through the 2000s, including at the time of the Dotson murder investigation at issue here.

96.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

97.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation into the Dotson murder.

98.     In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally

obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

99.     In addition, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

100.     Before and during the period in which Plaintiff was falsely charged with and convicted of the Jackson murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

101.     As a result, Chicago police detectives and their supervisors were able to engage in rampant misconduct with impunity, and as a result caused scores of wrongful convictions just in Area 5, where Defendants were assigned, and hundreds more City-wide.

102.     The City of Chicago and its police department also failed in the years prior to Jackson's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.  The conduct of live lineup, photographic, and other identification procedures;

b.  The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory

evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

  c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

  d. The risks of wrongful conviction and the steps police officers should take to minimize risks;

  e. The risks of engaging in tunnel vision during investigation;

  f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

103. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Jackson's wrongful conviction and his injuries.

104. The Chicago Police Department also failed to appropriately supervise its officers.

105. The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected.

Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

106.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

107.     In addition, the DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

108.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid

16

settlements to plaintiffs alleging violation of their civil rights, and did not conduct any disciplinary investigations in over half of those cases.

109.    Since before Jackson's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

110.    Charlie Beck, the former interim superintendent of the CPD, acknowledged the existence of the CPD's code of silence.

111.    As a result of the City of Chicago's established practices, Defendant Officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This belief extends to the Defendants in this case.

112.    The Code of Silence is so pervasive that, as in this case, it often involves other law enforcement officers and agencies, like the Felony Review Unit of the Cook County State's Attorney's Office.

113.    Defendant Officers engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

114.    Part and parcel with this history of fostering egregious misconduct, the Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

115.    This history goes back at minimum to the 1980s and has continued well into the 2000s and includes the conduct of infamous Chicago Police Detectives including Jon Burge, Kenneth Boudreau, Kriston Kato, Reynaldo Guevara, and many others. In many cases, these and other Chicago Police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions from suspects, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

116.    The wrongful conviction of innocent persons who gave coerced and false confessions include numerous cases in which Chicago Police Detectives used the very same tactics that the Defendants employed against Plaintiff in this case. These tactics include: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants; (c) the fabrication of confessions; (d) the misleading of parents and denial of parents' access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of

18

leniency in exchange for "cooperation" in the form of a confession; and (h) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

117.    At the time of the events leading to Plaintiff's coerced confession and wrongful conviction, members of the Chicago Police Department systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit. Youth are inherently more suggestible, they are vulnerable to manipulation, and they frequently lack the ability to fully understand—let alone assert—their rights during an interrogation.

118.    As a matter of widespread custom and practice, Chicago Police Department Detectives, including but not limited to the Defendants, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close cases. Detectives systematically denied juvenile and teenager suspects access to their parents and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these teenagers to immense physical and mental pressure until they "confessed."

119.    The policy and practice of the City of Chicago is so well-established that it has important ramifications for misconduct in the Felony Review Unit ("FRU") of the Cook County State's Attorney's Office, which often includes young attorneys who are part of the investigation in CPD Detective Divisions and work alongside police officers. As a consequence, the misconduct and coordination between the Defendant Officers and Defendant Cataldo during the investigation of the murder of Mitchell Dotson was not unique or isolated. Instead, members of the FRU as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating and coercing confessions from suspects in the custody of the Chicago Police

Department and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

120.    The manner in which the CCSAO staffs the Felony Review Unit also reinforces systemic and symbiotic misconduct. In particular, the CCSAO typically staffs the FRU with new, young prosecutors. Those prosecutors are quickly taught that they have to be "team players" and go along with the actions of the CPD Detectives, even if their actions involve misconduct. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the Detectives, because performance in the FRU is a stepping stone to getting to the Trial Division of the SAO.

121.    The FRU attorneys are also implicitly taught, though pressure from CPD officers and their own supervisors, that they had to approve Detectives' charges even if they did not believe there was enough evidence, because standing in the way could be an impediment to getting into the Trial Division and because they would be punished by their supervisors for resisting not being "team players." Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

122.    The City's failure to train, supervise, and discipline its officers, including Defendants Wojcik, Howard, Trahanas, Best, and Engel condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Jackson in this case.

Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

123.    Defendant Wojcik has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case. In addition to several civil suits lodged against him and governmental investigations into his behavior, Defendant Wojcik is also among a small number of CPD officers with an extraordinarily high number of citizen complaints. At this moment, he has been accused of police misconduct through the citizen complaint process 44 times. The misconduct sustained or alleged against Defendant Wojcik includes: physical abuse, abusive interrogation techniques, obtaining false confessions through coercive interrogation techniques, concealing evidence in the course of investigating police misconduct or supervising misbehaving officers, refusing to investigate misconduct by other officers, fabricating evidence, forceful entry into complainants homes without a warrant, and the denial the right to an attorney to detained individuals.

124.    Examples of Defendant Wojcik's misconduct include:

    a.    His false reporting on the misconduct of Detective Guevara, who himself has a long history of misconduct and abuse. In 2000, Detective Wojcik was assigned to investigate allegations made against Detective Guevara by a defendant named Juan Hernandez. Hernandez had filed a complaint stating that Guevara had framed him for a murder he did not commit, and used improper line-up techniques in the process. Defendant Wojcik stated in a report that Hernandez was not a reliable witness because Hernandez had not alleged Guevara had acted improperly at his criminal trial. This was not true; eight months before Defendant Wojcik's report, Hernandez had raised that same issue in court.

b.     The role he played as "approving supervisor" in the investigation into Jason Van Dyke, who shot and killed Laquan McDonald in October 2014. As approving supervisor, he ratified police reports which later-released video revealed to be categorically false. These false police reports formed the foundation for what the State's Attorney's Office said was a "conspiracy to conceal the true facts of the events surrounding the killing of Laquan Mcdonald[.]" According to the State's Attorney's Office, these police reports "contained important false information in an attempt to prevent or shape any criminal investigation."

c.     In 1988, the FBI registered a complaint against Defendant Wojcik with the CPD's Office of Professional Standards ("OPS"). The FBI reported that it was conducting an investigation into the alleged extortion of a weapon from an FBI informant. This investigation included arranging the delivery of a firearm from the informant to Defendant Wojcik. The FBI discovered that the weapon's telescopic sight had been removed, and not inventoried by Wojcik or returned to the owner. The OPS investigators concluded there was no evidence of extortion but did find Wojcik failed to properly inventory the recovered property and had made a "false report" about the incident.

d.     In response to a lawsuit filed against the City of Chicago, OPS investigated eight officers including Defendant Wojcik for their involvement in a wrongful conviction. The suit alleged that in October 1988, these officers forced a Chicago citizen to sign a false confession following threats by Defendant Wojcik and others.

e.     In September 1989, a citizen filed a complaint with OPS alleging that Defendant Wojcik and others physically and verbally abused him. This included yelling "1 am going to break your fucking arm" and proceeding to twist his arm behind his back until his elbow fractured. It also included throwing him to the ground and kicking him.

22

f.  In November 1989, a citizen filed a complaint with OPS alleging that Defendant Wojcik had pointed a gun at him, struck his car with a squad car, threw him and another individual to the ground, kicked him and another individual in the face, and punched him and two others in the face.

g.  In March 1991, a citizen filed a complaint with OPS alleging that Defendant Wojcik had punched him in the face during his arrest and while he was being held in an interrogation room. The citizen required medical attention at a hospital. Defendant Wojcik admitted to OPS investigators that he struck the citizen in the face, but claimed he did so "to control him" after he became violent.

h.  In September 1991, Gilbert Renslow sued Defendant Wojcik and the City of Chicago, among others, alleging excessive force. The City settled the matter for $3000. Renslow v. Chicago, No. 91 C 5560 (N.D. 111. Jan. 14, 1992)

i.  Defendant Wojcik beat Roosevelt Myles in December 1992 and attempted to force him to falsely confess to a crime that he did not commit. Defendant Wojcik beat Roosevelt with a phone book and a flashlight while he was handcuffed to a wall and "kept slapping [him] until [he] said [he would] sign a statement." Defendant Wojcik likewise coerced witnesses into falsely identifying Roosevelt.

j.  On July 2, 1994, a citizen filed a complaint with OPS reporting that Defendant Wojcik was verbally abusive and threatening during a traffic stop and proceeded to use his police car to push the complainant's car into a tree.

k.  In 1994, OPS sustained an allegation against Defendant Wojcik for forcing entry into an ex-girlfriend's home, striking the ex-girlfriend's then-boyfriend on the head and face, and recommended that he be suspended.

23

l.   In April 1995, Angel Rosado was arrested and handcuffed to a wall in an interrogation room. Defendant Wojcik and another individual asked him about homicide. When Angel said he did not know anything about it, the detectives "got physical" and "repeatedly smacked" Angel and choked him. The abuse "went on for hours." Because Angel was "fatigued and tired of being roughed up" by Defendant Wojcik, he "finally went along with [the police] and made a statement."

m.   In October 1998 a citizen filed a complaint with OPS reporting that Defendant Wojcik had struck an individual on the head with a shotgun during an arrest. The victim was treated at the hospital for a laceration to the head, which he told doctors was caused by being struck with the shotgun.

n.   In August 1999, a citizen filed a complaint with OPS reporting that Detective Guevara had grabbed his face and arms, placed him into a headlock, and elbowed him while attempting to force him into a lineup. An OPS investigator himself further reported that Detective Guevara had "failed to provide for the safety and security of [redacted] who was injured in his custody, and failed to seek medical treatment for him[.]" During this same incident, Defendant Wojcik struck the victim in the face five to ten times.

o.   In March 2001, a citizen filed a complaint with OPS reporting that Defendant Wojcik slapped him multiple times on each side of the face, punched him in the stomach, kicked him when he fell to the floor, and grabbed him by the throat. Defendant Wojcik further refused to allow him to speak to an attorney.

p.   In August 2001, Defendant Wojcik arrested Miguel Skerrett, and questioned him about a crime that had occurred at a grocery store. Miguel denied knowledge of the crime and asked to speak to a lawyer, but no lawyer was ever summoned. Wojcik then interrogated Miguel

for a second time, where he struck Miguel, pushed him up against a wall, punched him in the stomach, and kick him in the back after he fell to the ground. At that point Miguel told Defendant Wojcik he would be willing to cooperate with him, so long as he would stop hitting him. Defendant Wojcik then told Miguel what to say, and Miguel provided a false confession.

q.    In August 2001, Phonakone Sangathit was arrested and beaten by two Chicago Police detectives. Defendant Wojcik later came into the room and told Phonakone if he cooperated with the investigation, he would make sure that the Detectives – Bella and Balodimas – would not hurt him or put his hands on him again. When Phonakone told Defendant Wojcik he knew nothing, that he was scared for his life, and that he wanted to call his lawyer, Defendant Wojcik told Phonakone to ""tell me the truth or I will get Bella and Balodimas back in here and they will beat you until you tell the truth." When Phonakone insisted he knew nothing about the crime, Defendant Wojcik punched him several times in the chest and back of the head, grabbed him by the neck and choked him while slamming his head into a wall. As a result, Phonakone "blacked out." When he woke up, Defendant Wojcik was standing in front of him and said "I'll just say you admitted something to me so they won't have to come back in here and beat you to death."

r.    In March 2004, a citizen filed an OPS complaint reporting he was placed in an Area 5 interrogation room in and Defendant Wojcik held him by the arms while another detective held his legs and a third punched him 15 to 20 times in the ribs.

s.    In July 2005, Janet Yurus was arrested by Defendant Wojcik and others. Janet repeatedly asked for a lawyer but was denied. While being transported back to the station, Janet was placed unbuckled in the back of a police van. During the drive, she was knocked out of her seat, and suffered a laceration on her face. At the station Defendant Wojcik repeatedly promised

Janet she would be released if she told the police "what they wanted to hear." Wojcik "threatened to lock [her] up and charge [her] with murder" for the death of her son, an unrelated incident that had already been determined to be an accident. Defendant Wojcik also threatened to "lock up her daughter and call DCFS to have her grandchildren taken away."

       t.    In December 2007, a citizen filed a complaint with OPS alleging that he was held for three days by Defendant Wojcik without charges before he was released.

       u.    In 2012, Defendant Wojcik was accused of false imprisonment by the decedent of Steven M. Dick. Steven's special administrator alleged he was falsely charged by the Chicago Police on several misdemeanor counts and was later granted a bond for his release. The administrator then alleged Defendant Wojcik refused Steven's release, instead telling him that he would not be released unless he agreed to be admitted to a hospital for a mental condition. Finally, the administrator alleged that Defendant Wojcik drove Steven to the West Side Veterans Hospital and sought to have him admitted as a psychiatric patient. The parties eventually settled the case. *See Ellwood v. City of Chicago*, 1:08-cv-04586 (N.D. Ill).

       v.    Defendant Wojcik was also recently accused by Venus Rodriguez of covering up the physical assault of an off-duty Chicago police officer. Venus was at a bar when the Defendant officer attacked her and a male companion. The investigation of the attack was assigned to Defendant Wojcik. However, instead of investigating the case, Venus alleges Wojcik actively deterred her from pursuing the internal investigation or any criminal charges against her attacker. The case is still ongoing. *See Rodriguez v. City of Chicago*, 1:17-cv-07248 (N.D. Ill).

     125.    Similarly, Defendants Pete Best and Daniel Engel each have a long history of misconduct allegations. Defendant Best and Defendant Engel each have at least twenty citizen complaints of misconduct, making them outliners within the department.

26

126.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

127.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violation of constitutional rights described herein.

**Jackson's Damages**

128.    Jackson spent 20 years of his life imprisoned for a crime he did not commit.

129.    For those 20 years, Jackson was threatened and attacked by guards and inmates, experienced physical injuries, and constantly feared for his life.

130.    Additionally, the emotional pain and suffering caused by the Defendants' misconduct has been, and continues to be, substantial.

131.    Because of Defendants' misconduct, Jackson was taken away from and missed out on, the lives of his family and friends. Jackson was only seventeen years old when he was arrested for a murder he did not commit. He was robbed of opportunities to gain an education, to establish and develop a career, and pursue his interests and passions.  Instead, he was forced to grow up in prison, where his life was in constant danger.

132.    Jackson has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

27

133.    Jackson lived in constant emotional anguish, never knowing whether the truth would ever come out and whether he would ever be exonerated.

134.    In addition to the severe trauma of wrongful imprisonment and Jackson's loss of liberty, Defendants' misconduct continues to cause Jackson extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Jackson has also suffered profound and continuing reputational harm as a result of being labeled a murderer.

### COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

135.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

136.    As described in detail above, the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

137.    In the manner described more fully above, Defendants fabricated evidence and statements falsely implicating Plaintiff in the crime.

138.    Defendants knew this evidence was false.

139.    Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

140.    In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that

28

Defendants had manufactured false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

141.    In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

142.    The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

143.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

144.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

145.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT II
### 42 U.S.C. § 1983 – Coerced and False Confession
### (Fifth and Fourteenth Amendments)

146.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

147.    In the manner described more fully above, the Defendant Officers and ASA Defendant Cataldo, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as

under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

148.    In addition, the Defendant Officers and ASA Defendant Cataldo, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

149.    In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

150.    Specifically, Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the murder of Mitchell Dotson.

151.    Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his

detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Dotson murder.

152.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

153.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

154.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

155.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

156.    In the manner described above, the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

157.    In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

158. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

159. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

160. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**

161. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

162. In the manner described above, during the constitutional violations described herein, one or more of the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

163. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

164. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

165. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

167.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

168.    In the manner described more fully above, the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns, acting in concert with one another and other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Dotson shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

169.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

170.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

171.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

172.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

173.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

174.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

175.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

176.    At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

177.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

178.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

179.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees

35

such that the coercive interrogations continued unchecked and (7) failing to take appropriate precautions during interrogations to protect the rights of vulnerable juveniles, and instead subjecting them to unlawfully suggestive and coercive interrogations to obtain false confessions.

180.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

181.     These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

182.     The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

183. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

184. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

185. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
## State Law Claim – Malicious Prosecution

186. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

187. In the manner described above, the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

188. In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

189.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in 2022.

190.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

191.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

192.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

193.    The actions, omissions, and conduct of the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

194.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Willful and Wanton Conduct

195.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

196.     At all times relevant to this complaint the Defendant Officers, ASA Defendant Cataldo, and Defendant Crowns had a duty to refrain from willful and wanton conduct in connection with the Dotson murder investigation.

197.     Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

198.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim – Civil Conspiracy

199.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

200.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

201.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

202.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

203.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

204.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

205.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

206.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

207.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
### State Law Claim - Indemnification

208.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

209.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

210.    The Defendant Officers were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

211.    Defendant City of Chicago is responsible to pay any judgment entered against the Defendant Officers.

212.    Defendant Cataldo and Defendant Crowns were employees, members, and agents of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

213.    Defendant Cook County is responsible to pay any judgment entered against Defendant Cataldo and Defendant Crowns.

WHEREFORE, Plaintiff JEREMY JACKSON, respectfully requests that this Court enter a judgment in his favor and against Defendants ANTHONY WOJCIK, JANIT HOWARD, JOHN TRAHANAS, PETE BEST, DANIEL ENGEL, the CITY OF CHICAGO, JOSEPH CATALDO, DR. KENDALL CROWNS, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, JEREMY JACKSON, hereby demands a trial by jury pursuant to Federal Rules of Procedure 38(b) on all issues so triable.

                                        **JEREMY JACKSON**

                                BY:    /s/ Jordan Poole
                                        *One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
poole@loevy.com

Jennifer Blagg
1509 W. Berwyn Ave. Suite 201E
Chicago, Illinois 60640
(773) 859-0081
jennifer@blagglaw.net